**JEFFREY M. BROWN ASSOCIATES, INC., Plaintiff,**

v.

**CRK CONTRACTING OF SUFFOLK, INC., Defendant.**

**No. CIV. A. 99–5487.**

United States District Court, E.D. Pennsylvania.

Dec. 11, 2000.

Roy S. Cohen, Cohen, Seglias, Pallas & Greenhall, George E. Pallas, Cohen and Huntington, P.C., Nicole L. Herman, Cohen, Seglias, Pallas & Greenhall, Edward T. De Lisle, Cohen & Huntington, PC., Philadelphia, PA, for Plaintiff.

Ronald A. Krauss, White and Williams, Austin Hogan, White and Williams, Philadelphia, PA, Gerald Zisholtz, Stuart S. Zisholtz, Arnold J. Kaplan, Mineola, NY, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, Senior District Judge.

This case arises out of contract disputes with respect to three construction projects.

## I. FINDINGS OF FACT

### A. General Background

1. Plaintiff Jeffrey M. Brown, Associates, Inc., ("JMB") is a general contractor. In general, a general contractor is hired by a building owner to manage the process of constructing the building. Defendant CRK Contracting of Suffolk, Inc. ("CRK") is a company that specializes in the electrical components of a construction project.

2. The three construction projects at issue in this case are located in New York State, and are known as the "Flatbush" project, the "Glen Oaks" project, and the "Jericho" project. Each project involved the construction of a store that were eventually to be occupied by a merchant known commonly as Caldor.

3. With respect to each of these projects, JMB was responsible for negotiating and implementing individual subcontracts for different components of the construction work. In this capacity, JMB hired CRK as a subcontractor on each of the three projects to perform certain electrical work within certain time frames. JMB was also responsible to the project owner for providing proper supervision, coordination and overall organization of the various components of each project, so as to ensure the completion of the entire project within a specified time period required by the owner.

4. In this action, plaintiff JMB alleges that defendant CRK breached each of its three contracts by failing to perform its electrical work in a timely manner, which in turn caused delays in the construction of other components of the building. JMB seeks to recover certain monetary amounts from the CRK under specific contractual provisions that essentially track the common law of contracts in Pennsylvania,

which is the governing law by the express terms of the contracts. JMB's claims largely involve expenditures incurred by it in hiring others to complete the electrical work within a time frame acceptable to the owners of the projects. Many of JMB's claims are described as "back charges," a term generally used in the construction field to describe such costs of completion.

5. Three witnesses offered live testimony in the course of this trial. Also submitted were transcripts of testimony given by six other witnesses at a previous trial, which also concerned contractual disputes with respect to these projects and which was conducted over the course of six weeks by the Supreme Court of New York (Civ.Act. No. 97–10678). Key witnesses in the trial before this court include Jeffrey M. Brown, Chief Executive Officer of plaintiff company JMB; A1 Sampson, the project superintendent for JMB on the Glen Oaks project; and Robert Kohlmeyer, the president of defendant company CRK. Voluminous exhibits from the previous trial were also submitted, as well as numerous additional exhibits generated specifically for this trial.

*B. The Flatbush Project*

6. In this action with respect to the Flatbush project, JMB seeks to recover, on the basis of the alleged default by CRK, the actual costs of material and labor to complete CRK's work, plus profit, attorney's fees and costs of supervision. JMB also seeks to recover 26 back charges based upon numerous grounds, including CRK's alleged failure to remove debris generated from CRK's work and left at the site; overtime charges incurred by other subcontractors who allegedly could not perform their duties in a timely fashion because of delays in electrical work; damage allegedly done by CRK to other work on the building; and CRK's alleged failure to provide certain equipment.

7. Work on the Flatbush project, including electrical work by CRK, was underway by the late fall of 1994.

8. On or about December 22, 1994, a precast concrete beam being lifted by a crane at the project site was dropped, and the appropriate government agency ordered the project to be shut down temporarily for safety reasons. Work reopened on January 6, 1995.

9. On January 13, 1995, there was another precast concrete accident, and the job was again shut down by the government. Work resumed on or about January 31, 1995.

10. JMB declared CRK in default of its contract obligations by letter dated April 3, 1995 based on the alleged failure of CRK to perform its electrical work in accordance with the schedule as modified after the project shutdowns. At trial, CRK did not dispute that the entire project, including the electrical work, was behind schedule, but offered evidence that the delay of the entire project was due to circumstances beyond its control.

11. After CRK received the letter notifying that it was in default, CRK continued to work on the project. The electrical work was eventually completed to the satisfaction of the owner with the assistance of a second electrical subcontractor hired by JMB.

12. Mr. Brown testified at trial that the main blame for the delay in the completion of the project lay with CRK. Mr. Brown's testimony, however, is not credible, as he took contrary positions at trial as to the status of progress on the job, undercutting the believability of his testimony.

13. The main reasons for the delay were the precast concrete accidents and other difficulties in scheduling, coor-

dination, and conveying information. Mr. Brown correctly conceded at trial that the job delay was due to a large extent to the two shutdowns by the local government caused by the precast concrete accidents.

14. CRK's electrical work was behind schedule for numerous other reasons as well. For example, the testimony of Mr. Kohlmeyer established that the drawings for the job were constantly being revised, including those required to install the site lighting and those required to implement the Energy Management System. These revisions interfered with the ability of CRK to timely perform its duties; in fact, before the electrical subcontractor had even received the final plans and specifications drawings necessary to complete its work, it received notice of its alleged "default."

15. Furthermore, CRK's failure to complete its portion of the work was in part due to the fact that necessary items, such as lighting fixtures and equipment, were not delivered to the site in a timely fashion, due in part to delays in finalizing the drawings and the fact that certain products require substantial advance notice prior to delivery. In addition, CRK was prevented from performing by the fact that other prerequisite work was not completed in a timely manner. For example, evidence established that roof leaks created muddy conditions within the interior of the structure, which in turn prevented the pouring of the concrete floor slabs that was required before the electrical work could be finished. Work by the electrical subcontractor on the conveyor had to wait until the conveyor was completely installed. CRK also could not install outlets and switches until the drywall was completed. Ceiling installation, which was delayed, was necessary for CRK to be able to install switches and alarms and per-form other necessary work. Because heating, ventilation and air conditioning units were not delivered to the site in a timely manner, CRK could not hook them up within the required time frame. The haphazard progress of the job resulted in the owner underpaying the general contractor, which in turn resulted in the general contractor underpaying the subcontractors, which demoralized those working on the project. The entire project was behind schedule; in sum, the whole job was a disaster. Significantly, the job was a disaster primarily for reasons unattributable to the CRK's actions.

16. In addition, with respect to the back charges claimed against the defendant that did not directly arise from the delays in the project, the testimony presented in support of these back charges was effectively rebutted and outweighed.

C. The Glen Oaks Project

1. The Glen Oaks project involved the construction of another store that was eventually to be occupied by Caldor. JMB subcontracted certain electrical work to CRK with respect to this project.

2. With respect to the Glen Oaks project, JMB seeks to recover from CRK the costs of completion and/or correction of certain aspects of an audio system in the building, an electrical generator, circuit breakers, a fire and smoke alarm system, and other electrical work. JMB also claims back charges related to the hiring of a consultant to obtain weekend work permits, which were required to permit the overtime work necessary to complete the project on time. In addition, JMB seeks back charges related to the removal of CRK's debris from the site, and seeks to recover $35,000 allegedly owed by CRK on a loan from JMB secured by a promissory note, and $10,000 for own-

er's manuals and warranties that CRK allegedly failed to provide.

3. Work on the Glen Oaks project began in the spring of 1995 and was originally to be completed in the fall of 1995.

4. The Glen Oaks project shut down in September, 1995 because Caldor had filed for bankruptcy. Work resumed in the late fall of 1995.

5. In a letter dated March 1, 1996 to CRK, JMB stated that CRK was in default.

6. The shut down of the project due to the bankruptcy filing of Caldor, and the subsequent uncertainty of the project's future, was the primary reason for delay on the project, including delay in the electrical work.

7. Conflicting testimony was offered as to whether the electrical work was in fact substantially completed by CRK.

8. As to the various back charges claimed by JMB: Mr. Sampson conceded at trial that the back charge claimed against CRK for new circuit breakers was incorrect, as the reinstallation of the machinery was due to the fact that the plans and specifications followed by CRK were not in accordance with code. In addition, evidence established that CRK cleaned up its own debris from the site and did not show that the clean up costs that JMB seeks to charge to CRK are properly attributable to CRK; to the contrary, these costs were attributed to CRK in an arbitrary manner. Also, the costs of obtaining the weekend work permits cannot be attributed to CRK, as CRK was not the cause of the delays that necessitated the weekend work permits.

9. Finally, testimony and documentary evidence also did not sufficiently establish that CRK is liable for any of the other claims, the promissory note, or the owner's manuals and warranties claimed by JMB. With respect to these items, the evidence presented was conflicting or had insufficient probative value, or no evidence was presented.

10. Also in this action, CRK counterclaimed against JMB for $104,472.00 for the outstanding balance of the contract price.

11. However, CRK submitted into evidence a document titled "Subcontractor Application for Payment" and dated April 22, 1996 (labeled as Kohlmeyer Exhibit One), which establishes with reasonable certainty the amount properly due to the electrical subcontractor. This amount is the difference between the total value of work performed by CRK (the original contract price plus the approved change orders) and the payments that were made by JMB to CRK. This amount is $24,853.00.

### D. The Jericho Project

1. Although JMB claims damages against CRK in its complaint for material breach on the Jericho project, Mr. Brown admitted at trial that the electrical subcontractor performed fairly well in its duties on the Jericho project.

2. CRK also counterclaimed with respect to the Jericho project. The amount due to CRK is $67,863.00, as previously entered as a matter of summary judgment prior to this bench trial.[1] This amount gives JMB full credit for its payments to CRK, and rejects CRK's claim for a larger amount.

3. CRK's efforts to claim a larger amount are not supported by credible testimony or documentary evidence.

---

1. *See* Memorandum and Order dated June 14, 2000 (discussing plaintiff's motion for partial summary judgment on the defendant's counterclaims and defendant's motion for partial summary judgment).

## II. CONCLUSIONS OF LAW

### A. The Flatbush Project

 1. Defendant CRK bears no liability to plaintiff JMB for the delays in the Flatbush project because CRK did not cause the delays, and therefore CRK was not in default of its contract as detailed in Section I.B. *See, e.g., Craig Coal Min. Co. v. Romani*, 513 A.2d 437, 355 Pa.Super. 296 (1986); *see also* RESTATEMENT OF CONTRACTS (SECOND) §§ 261 and 263 (1979).

2. This court has previously ruled that with respect to the Flatbush project, defendant CRK's counterclaims for compensation by plaintiff JMB are barred because of the prior litigation of those issues in New York.[2]

### B. The Glen Oaks Project

 3. With respect to the Glen Oaks project, plaintiff JMB has not met its burden of proving its claim, by a preponderance of the evidence, that defendant CRK was in material breach of its contract, or that CRK is liable for any back charges or other monetary amounts claimed.

4. With respect to counterclaims, defendant CRK has not met its burden of proving by a preponderance of evidence that it is due any amount other than $24,853.00.

### C. The Jericho Project

 1. Plaintiff JMB has not sustained its burden of proving, by a preponderance of the evidence, its claim of material breach by defendant CRK with respect to the failure to perform.

2. With respect to counterclaims, defendant CRK has not sustained its burden of proving by a preponderance of evidence that it is due any damages other than $67,863.00..

**2.** *See* Memorandum and Order dated June 14, 2000.

### JUDGMENT

**AND NOW**, this 11th day of December, 2000, after a bench trial, judgment is entered on the claims pled in the complaint in **FAVOR** of the defendant, CRK Contracting of Suffolk, Inc., and **AGAINST** the plaintiff, Jeffrey M. Brown Associates, Inc..

Judgment on the counterclaims is entered in FAVOR of the defendant, CRK Contracting of Suffolk, Inc., and **AGAINST** the plaintiff, Jeffrey M. Brown Associates, Inc., in the total amount of $92,716.00.